[Cite as *State v. Johnson*, 2011-Ohio-1919.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 94813**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ANTHONY JOHNSON

DEFENDANT-APPELLANT

**JUDGMENT:**
**CONVICTION AFFIRMED, REVERSED AND**
**REMANDED FOR RESENTENCING**

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-528422

**BEFORE:** Jones, J., Blackmon, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** April 21, 2011

ATTORNEY FOR APPELLANT

Thomas A. Rein
Leader Building, Suite 940
526 Superior Avenue
Cleveland, Ohio 44114


ATTORNEYS FOR APPELLEE

William D. Mason
Cuyahoga County Prosecutor

BY: Pinkey S. Carr
Assistant Prosecuting Attorney
The Justice Center, 8ᵗʰ Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, J.:

{¶ 1} Defendant-appellant, Anthony Johnson ("Johnson"), appeals his conviction and sentence. We affirm the conviction, but reverse the sentence and remand for resentencing.

I. Procedural History and Facts

{¶ 2}    In September 2009, Johnson was charged with aggravated murder, with a victim under the age of 13 murder specification, notice of prior conviction, and repeat violent offender specification.  He was also charged with two counts of child endangerment.  The case proceeded to a jury trial, with the exception of the repeat violent offender specification, which the court determined.

{¶ 3}    At the close of the state's case, the defense made a Crim.R. 29 motion for acquittal, which was denied.  The defense rested without presenting any evidence.  Its renewed motion for an acquittal under Crim.R. 29 was denied.   The defense requested that the jury be instructed on murder and involuntary manslaughter.  The court granted the request as to the murder instruction, but denied it as to the involuntary manslaughter instruction.

{¶ 4}    The jury found Johnson guilty of murder and both counts of child endangerment.   The court found him guilty of the repeat violent offender specification.  The court merged the two counts of child endangerment and sentenced Johnson to 33 years-to-life in prison, which included an eight-year sentence on Count 3, child endangerment.

{¶ 5}    The trial testimony revealed the following facts.  Johnson and Erika Bush began dating when they were 33 years of age and 20 years of age, respectively.  Less than a year into their relationship, Bush became pregnant with the victim, Anthony Johnson, Jr. ("Anthony").  Although Johnson seemed "fine" with the pregnancy at first, he later expressed to Bush his displeasure with the pregnancy and indicated that he did not want her to have the

baby. Johnson's behavior toward Bush included him threatening her; Bush changed her telephone number because of the threats.

{¶ 6} Baby Anthony was born on February 22, 2008; Johnson was not present for his birth. After the baby's birth, Bush initiated court proceedings in an attempt to collect child support from Johnson. Her attempt further angered Johnson.

{¶ 7} In late October 2008, Johnson and Bush appeared in court for a child support hearing. After the hearing, Bush asked Johnson if he wanted to see their son. Johnson did not respond; he just had a "blank look on his face." A few hours after the hearing, Bush was driving in her car with baby Anthony when she saw Johnson driving in his car. She followed him to his house so that he could see the baby. Bush asked Johnson if Anthony could stay with him for a couple of hours and Johnson agreed. When Bush returned to get the baby, Johnson yelled at her because the baby had a runny nose. Johnson and Bush did not have contact with each other again until March 2009.[1]

{¶ 8} At that time, Johnson contacted Bush about delivering clothes he had for the baby and the two agreed to meet. Bush went to Johnson's house; she had baby Anthony with her and Johnson put the clothes in her car and sat in the backseat, playing with the baby for a few minutes. The next contact Johnson and Bush had occurred in April 2009, when Johnson

---

[1]Johnson contacted Bush's mother in November 2008 about getting some clothes for Anthony. Bush invited Johnson to the baby's first birthday party, which was in February 2009, but Johnson did not attend.

called Bush and told her that his other son from another relationship wanted to meet Anthony. Bush agreed and took Anthony to Johnson's house the following day. Johnson asked if the baby could sleep at his house overnight, but Bush said no. She left the baby at Johnson's house for about three hours.

{¶ 9} Another child support hearing was held, upon Johnson's motion, in May 2009. Johnson appeared at the hearing, but Bush did not, which upset Johnson. After calling Bush and yelling at her, Johnson sent her a text message asking her to pray for him.

{¶ 10} Between May 2009 and August 2009, Johnson saw Anthony about once every other week. The visitations took place at Johnson's house.

{¶ 11} The following events transpired in the days leading up to baby Anthony's death. On August 9, 2009, Bush asked Johnson if the baby could come over while she went grocery shopping and he agreed. About an hour or two after she left Anthony, she called Johnson to check on him. Johnson told Bush "[w]e're out and about, he's fine." Bush asked to speak with Anthony and Johnson put him on the phone. The phone dropped, and Johnson said that Anthony was eating but he had a "busted lip." When Bush inquired about what had happened, Johnson told her "[t]hat's what boys do * * * he's a boy and * * * he's gonna fall[,]" and told her not to shelter him. Bush examined Anthony when she picked him up later that day, but did not observe any injury.

{¶ 12} The following day, August 10, Johnson called Bush to ask if Anthony could

come over to spend time with his other son, and Bush agreed. When Bush called Johnson a couple of hours later to arrange to pick Anthony up, Johnson said that the baby was just about to lay down and asked if he could stay overnight; Bush said yes.

{¶ 13} The following day, August 11, Johnson asked Bush if Anthony could stay with him for the week. Bush agreed that Anthony could spend some more time with Johnson that day, but did not agree that he could stay for the week. During the course of the day, Bush called Johnson several times to check on Anthony and that upset Johnson. He yelled at her and brought up his displeasure about her filing for child support. At one point, Bush asked to speak with Anthony, but Johnson would not allow it. During a subsequent call that day, however, Anthony did speak to his mother. Bush told Johnson that she wanted to come get her son, but Johnson said they were not at his home. Anthony slept overnight again at Johnson's house and spent the following day there.

{¶ 14} The next day, August 12, in the evening, Johnson had company at his house — his brother Adrian Johnson ("Adrian"), and friends Simion Wright ("Simion") and Joseph Wilson ("Joseph"). By all accounts, the men, including Johnson, were drinking alcohol and smoking marijuana.

{¶ 15} Adrian testified that when he and the others arrived around 10:00 p.m., Anthony was on the couch and appeared to be sleeping. Adrian saw a scar on the baby's nose and forehead. Approximately ten minutes after Adrian and the others arrived, Johnson took the

baby upstairs.

{¶ 16} Meanwhile, Bush asked her friend Veronica if she could get Anthony from Johnson's house. Bush sent a text message to Johnson to let him know that Veronica was coming. Johnson called Bush and told her that he was not releasing Anthony to Veronica because it was after 10:00 p.m. and he just wanted him to go to sleep. Veronica arrived at Johnson's house, but did not go inside — Johnson met her at the door and came outside to talk to her. Veronica smelled the odor of marijuana on Johnson. Anthony again slept overnight at Johnson's house.

{¶ 17} At approximately 9:00 a.m. on August 13, Bush called Johnson to check on Anthony, but the call went straight to Johnson's voicemail. At about 5:00 p.m., Bush was driving to Johnson's house when she received a call from him. Johnson told her that they needed "to be strong." According to Johnson, his mother came to his house and saw that Anthony was "breathing funny" and told Johnson that he needed to take the baby to the hospital, which he did. Bush drove to the hospital. Anthony was pronounced dead a few minutes after Bush arrived.

{¶ 18} The trial evidence revealed that when Johnson brought Anthony to the hospital he was not breathing and did not have a pulse. The treating physician described Johnson as "almost reluctant" to bring Anthony into the examining room. Johnson told the doctor that Anthony had fallen in the driveway the day before and later did not want to wake up from his

nap.

{¶ 19} The treating physician believed that Anthony had been abused and died of cardiopulmonary arrest secondary to trauma or abuse based on the following: (1) multiple abrasions and contusions about the forehead and under the left eye; (2) hematotympanum of the left ear;[2] (3) ruptured blood vessels in the baby's retinas, which is indicative of a shaken baby; (4) bruising not consistent with a fall; and (5) handprints on the baby's left arm and thigh. According to the doctor, the injuries were one to two days old. The doctor also believed that Anthony was dead upon arrival at the hospital, and that he had died six to 12 hours prior to being brought to the hospital.

{¶ 20} A forensic pathologist from the County Coroner's Office believed many of Anthony's injuries occurred several hours to a day prior to his death and were caused by blunt force impacts. Further, the injuries were not consistent with a fall. Based on her findings, the pathologist determined the manner of death to be homicide, and the cause of death to be "blunt impacts to the head, trunk, and extremities with cutaneous and vascular injuries."

{¶ 21} The coroner's office also conducted DNA testing on several items from Johnson's home. One of the items, a baseball bat, had traces of blood on it but there was not a sufficient amount of DNA to return a reliable sample.

{¶ 22} Police officers responded to the hospital, and after being advised of his rights,

---

[2]Hematotympanum is a condition where blood collects around the eardrum and is frequently

Johnson agreed to talk. Johnson told the police that the bruises on Anthony's thigh resulted from Johnson twice "backhanding" the baby because he was pulling his dog's tail. Johnson further said that Anthony got the injuries to his forehead and face when he was outside playing with a ball and fell while chasing it down the driveway. The police described Johnson as "non-emotional[,]" "indifferent[,]" "he had no emotion one way or the other, he wasn't mad, upset, [or] crying."

{¶ 23} Johnson has assigned the following errors for our review:

{¶ 24} "I. The trial court erred in denying appellant's motion for acquittal as to the charges when the state failed to present sufficient evidence to sustain a conviction.

{¶ 25} "II. Appellant's convictions are against the manifest weight of the evidence.

{¶ 26} "III. The trial court abused its discretion and deprived appellant of his constitutional right to a fair trial by denying appellant's request for a jury instruction on involuntary manslaughter.

{¶ 27} "IV. Appellant was denied a fair trial due to the trial court's finding that appellant would have to testify in order to warrant a jury instruction on involuntary manslaughter in violation of his constitutional right to remain silent.

{¶ 28} "V. The trial court erred by admitting evidence of appellant's prior convictions where an admission was available and by allowing the state to present evidence beyond the

seen in situations involving trauma or skull fractures.

conviction it needed which resulted in unfair prejudice and denied appellant a fair trial.

{¶ 29} "VI. The trial court erred by ordering convictions and a consecutive sentence for separate counts of murder and endangering children because the offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transaction under R.C. 2929.14."

II. Law and Analysis

Sufficiency and Weight of Evidence

{¶ 30} In his first two assignments of error, Johnson contends that his murder conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.

{¶ 31} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, paragraph two of the syllabus. In *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court delineated the role of an appellate court presented with a sufficiency of the evidence argument as follows:

{¶ 32} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements

of the crime proven beyond a reasonable doubt. * * *"    Id. at paragraph two of the syllabus.

{¶ 33} A manifest weight of the evidence claim requires a different review.  The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other.  *State v. Brindley*, Franklin App. No. 01AP-926, 2002-Ohio-2425, ¶16.  When presented with a challenge to the manifest weight of the evidence, an appellate court, after "'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"    *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.  An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "'exceptional case in which the evidence weighs heavily against the conviction.'"  Id.

{¶ 34} Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.  *State v. Braxton*, Franklin App. No. 04AP-725, 2005-Ohio-2198, ¶15.  "[T]hus, a determination that a conviction is supported by the weight of the evidence will also be

dispositive of the issue of sufficiency." Id.

{¶ 35} R.C. 2903.02 governs the crime of murder and provides in relevant part that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." R.C. 2903.02(B).

{¶ 36} The predicate offense for the felony murder charge in this case was child endangering under R.C. 2919.22(B)(2), which provide as follows:

{¶ 37} "(B) No person shall do any of the following to a child under eighteen years of age * * *:

{¶ 38} "(2) Torture or cruelly abuse the child[.]"

{¶ 39} The weight of the evidence supports the murder conviction.

{¶ 40} The evidence further demonstrated Johnson's indifference toward baby Anthony; he was not present for his birth or first birthday party, and his relationship with him started only because of Bush's persistence.

{¶ 41} Johnson's anger toward Bush continued throughout their relationship and was evident in the days leading up to Anthony's death. For example, when Bush called Johnson on August 11 to check on Anthony, Johnson yelled at her and reiterated his displeasure about her filing for child support. Johnson did not make baby Anthony available to Bush that day when she told him she wanted to get him.

{¶ 42} The following evening, August 12, Johnson had friends at his house, and one of the friends saw injuries on Anthony's nose and forehead as he appeared to be sleeping on the couch. Bush had arranged for her friend Veronica to get the baby from Johnson, but Johnson would not allow it.

{¶ 43} The evidence further demonstrated that when Johnson did bring baby Anthony to the hospital on August 13, he was "almost reluctant" to bring the baby into the examining room. The treating physician believed that Anthony was dead upon arrival at the hospital, and that he had died six to 12 hours prior to being brought to the hospital. The doctor believed that Anthony had been abused and died of cardiopulmonary arrest secondary to trauma or abuse.

{¶ 44} A forensic pathologist likewise opined that Anthony's injuries were caused by blunt force impacts and determined that the cause of death was homicide. Both the pathologist and treating physician testified that baby Anthony's injuries were not caused by a fall, as Johnson contended. Further, they both testified that the injuries occurred during the time period when Anthony was under Johnson's care.

{¶ 45} Moreover, the police described Johnson as "non-emotional[,]" "indifferent[,]" and having "no emotion one way or the other, he wasn't mad, upset, [or] crying."

{¶ 46} On this record, we find that the manifest weight of the evidence supported the conviction. Because we find that the conviction was supported by the weight of the evidence,

we necessarily find that it is also supported by sufficient evidence. Thus, the first and second assignments of error are overruled.

<u>Denial of Request to Instruct Jury on Involuntary Manslaughter</u>

{¶ 47} For his third assigned error, Johnson contends that he was denied a fair trial because of the trial court's denial of his request for an involuntary manslaughter jury instruction.[3] In his fourth assignment of error, Johnson contends that the trial court denied him of a fair trial because it stated that he would have to testify in order to warrant an involuntary manslaughter instruction.

{¶ 48} Trial courts have broad discretion in determining whether the evidence adduced at trial was sufficient to warrant a jury instruction. *State v. Morris*, Guernsey App. No. 03CA29, 2004-Ohio-6988, reversed on other grounds, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174; *State v. Mitts* (1998), 81 Ohio St.3d 223, 228, 690 N.E.2d 522. "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Sims*, Cuyahoga App. No. 85608, 2005-Ohio-5846, ¶12, citing *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443. A trial court does not abuse its discretion by not giving a jury instruction if the evidence is insufficient to warrant the requested instruction. *State v. Lessin* (1993), 67 Ohio St.3d 487,

---

[3]The court granted the defense's request for a murder instruction, but denied the request for an

494, 620 N.E.2d 72. An "'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶ 49} In *State v. Kidder* (1987), 32 Ohio St.3d 279, 513 N.E.2d 311, the Ohio Supreme Court stated the following relative to instructing a jury on a lesser included offense:

{¶ 50} "A criminal defendant is entitled to a lesser-included-offense instruction [ ] only where the evidence warrants it. Thus, the trial court's task is two fold: first, it must determine what constitutes a lesser included offense of the charged crime; second, it must examine the facts and ascertain whether the jury could reasonably conclude that the evidence supports a conviction for the lesser offense and not the greater." (Citations omitted.) Id. at 280.

{¶ 51} Involuntary manslaughter is a lesser included offense of aggravated murder. *State v. Thomas* (1988), 40 Ohio St.3d 213, 215, 533 N.E.2d 286. Thus, we consider the second step for determining whether an involuntary manslaughter instruction should have been provided, that is, whether the evidence not only supported an acquittal on the initial crime, but also supported a conviction on the lesser included offense. An instruction on a lesser included offense is not required simply because some evidence of a lesser included offense is advanced. *State v. Hill*, Cuyahoga App. No. 87645, 2006-Ohio-6425, ¶32.

---

involuntary manslaughter instruction.

{¶ 52} Involuntary manslaughter is governed by R.C. 2903.04, which provides in pertinent part that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A).

{¶ 53} Johnson sought an involuntary manslaughter instruction with the predicate felony being child endangerment under R.C. 2919.22(A) (Count 2), which provides as follows: "(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

{¶ 54} The culpable mental state of involuntary manslaughter is supplied by the underlying offense. *State v. Wilson*, 182 Ohio App.3d 171, 2009-Ohio-1681, 912 N.E.2d 133, motion for delayed appeal granted 123 Ohio St.3d 1505, 2009-Ohio-6210, 917 N.E.2d 809, cause dismissed 124 Ohio St.3d 1424, 2010-Ohio-20, 919 N.E.2d 748. Reckless is the mental state for child endangering. *Cleveland v. Kazmaier*, Cuyahoga App. No. 84290, 2004-Ohio-6420. "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶ 55} In *State v. Finley*, Hamilton App. No. C-061052, 2010-Ohio-5203, the First

Appellate District reached the same result as here in a similar case. There, the defendant was charged with aggravated murder, murder, and felonious assault in connection with the death of his girlfriend's one-year-old son who was in the defendant's care for a day. At trial, the defendant requested an involuntary manslaughter instruction, but the trial court denied his request. In affirming the trial court, the First District stated that the victim "had been beaten from head to toe and had suffered a severe blunt-force injury to his head. Based on this evidence, no jury could reasonably have concluded that [the defendant] had inflicted these injuries recklessly * * *. Because the evidence did not reasonably support an acquittal of felony murder and a conviction on the lesser-included offense of involuntary manslaughter, [the defendant] was not entitled to the requested instruction." Id. at ¶30.

{¶ 56} Likewise, the evidence in this case did not support a finding that Johnson acted recklessly. The evidence presented was that Anthony died as a result of blunt impacts with excessive force to his head, face, trunk, and extremities that occurred while the baby was in Johnson's care. The injuries were not caused by a fall. Some of the injuries were observed by Johnson's brother on the evening of August 12. Johnson, however, did not take Anthony to the hospital until the evening of August 13, and even then was "almost reluctant" to bring him into the examining room. Moreover, the treating physician believed that baby Anthony was dead upon arrival at the hospital, and that he had died six to 12 hours prior to when Johnson brought him in.

{¶ 57} On this record, the court did not abuse its discretion by not instructing on involuntary manslaughter.

{¶ 58} We also find no merit to Johnson's claim that the court based its denial of an involuntary manslaughter instruction on the fact that Johnson did not testify. The record indicates that at the time the court entertained the defense's request for an involuntary manslaughter instruction, which was near the conclusion of the state's case, the court believed that the evidence did not support the instruction. The court merely stated that *if* Johnson should testify and present evidence that would support the instruction, it would give the instruction. Further, the court specifically acknowledged Johnson's right to remain silent, telling defense counsel, "I'm not suggesting to you that your client has to testify, the Court recognizes that he does not, that the burden is entirely upon the State of Ohio."

{¶ 59} In light of the above, the third and fourth assignments of error are overruled.

Evidence of Prior Convictions

{¶ 60} In his fifth assignment of error, Johnson contends that the trial court erred by admitting evidence of his prior child endangering conviction when an admission was available. He further contends that the trial court erred by allowing the state to present evidence beyond the conviction, i.e., evidence of a prior felonious assault conviction. The defense agreed to stipulate to the prior child endangering conviction, but the state did not accept the stipulation. Instead, the state presented the testimony of a representative from the county's clerk of courts'

office; the representative read the entire journal entry of conviction, which, in addition to the endangering children conviction, included a felonious assault conviction.

{¶ 61} Count 1 of the indictment, aggravated murder, had a notice of prior conviction for an April 1994 felonious assault, and a repeat violent offender specification, based on the same felonious assault. Count 3 of the indictment, endangering children, charged that Johnson "previously was convicted of an offense under this section."

{¶ 62} In regard to the state not accepting Johnson's proposed stipulation on the previous endangering children conviction, it was not obligated to do so. Neither the state nor the trial court is required to accept a defendant's stipulation to a prior conviction where the prior conviction is an element of the offense. *State v. Smith* (1990), 68 Ohio App.3d 692, 695, 589 N.E.2d 454. The prior endangering children conviction was an element of Count 3.

{¶ 63} In regard to the testimony of the prior felonious assault conviction, which, although it was not an element of any offense, was the prior conviction that was the subject of the notice of prior conviction and repeat violent offender specification, we find it to be harmless error under the circumstances of this case because the convictions here were supported by other substantial evidence. See *State v. Johnson*, Cuyahoga App. No. 91900, 2009-Ohio-4367, ¶26-27.

{¶ 64} In light of the above, the fifth assignment of error is overruled.

<u>Allied Offenses</u>

{¶ 65} In his final assignment of error, Johnson contends that his murder and child endangering convictions were allied offenses that should have merged at sentencing.

{¶ 66} The "merger doctrine" is codified under "R.C. 2941.25, which provides:

{¶ 67} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶ 68} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶ 69} The Ohio Supreme Court recently addressed the issue of merger in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. In *Johnson*, the defendant was convicted of felony murder under R.C. 2903.02(B) (based on the predicate offense of child endangering) and child endangering. Johnson contended that the felony-murder conviction and the child endangering conviction should have merged as allied offenses under R.C. 2941.25; the Ohio Supreme Court agreed.

{¶ 70} There, the defendant beat a 17-year-old boy after apparently becoming angered while helping him read. The boy died as a result of injuries sustained from blunt impact to his

head. There was arguably evidence in that case that there were two separate incidents,[4] but the Ohio Supreme Court "decline[d] the invitation of the state to parse [the defendant's] conduct into a blow-by-blow in order to sustain multiple convictions for the second beating." *Johnson* at ¶56. Rather, the Court found that the second beating was a "discrete act that resulted in the simultaneous commission of allied offenses, child abuse and felony murder." Id.

{¶ 71} In finding the murder and child endangering allied offenses under the circumstances presented in *Johnson*, the Court focused on the plain language and purposes of R.C. 2941.25:

{¶ 72} "We have consistently recognized that the purpose of R.C. 2941.25 is to prevent shotgun convictions, that is, multiple findings of guilt and corresponding punishments heaped on a defendant for closely related offenses arising from the same occurrence. This is a broad purpose and ought not to be watered down with artificial and academic equivocation regarding the similarities of the crimes. When 'in substance and effect but one offense has been committed,' the defendant may be convicted of only one offense.

{¶ 73} "Given the purpose and language of R.C. 2941.25, and based on the ongoing problems created by [*State v.*] *Rance* [(1999), 85 Ohio St.3d 632, 710 N.E.2d 699], we hereby

---

[4]The boy's mother was home at the time of the beating, but in a different room. She came to check on her son after hearing a "thump," "stomping," and the defendant yelling. After checking on the boy, the mother left the room again and shortly thereafter heard another "thump" or "stomp." *Johnson* at ¶54.

overrule *Rance* to the extent that it calls for a comparison of statutory elements solely in the abstract under R.C. 2941.25. When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." Id. at ¶43-44, quoting *State v. Botta* (1971), 27 Ohio St.2d 196, 204, 271 N.E.2d 776.

{¶ 74} Based on *Johnson*, Johnson's convictions in this case for murder and child endangering should have merged. The evidence demonstrated that the facts surrounding Johnson's convictions arose from the same conduct.[5] Therefore, Count 1 (murder) should have merged with Count 3 (child endangering by torture or cruel abuse) at sentencing.[6]

{¶ 75} Accordingly, the sixth assignment of error is sustained, and the case is remanded for resentencing.

It is ordered that appellant and appellee split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

---

[5]This case is distinguishable from this court's recent decision in *State v. Porosky*, Cuyahoga App. No. 94705, 2011-Ohio-330. There, this court found that the defendant's convictions for felonious assault and child endangering did not merge because the acts were committed with a separate animus. Id. at ¶11. Specifically, the defendant first injured his son, and then endangered him by failing to seek medical attention for approximately 12 hours after the injury, even though he knew the child was injured. Id.

[6]The court merged the two counts of child endangering, Counts 2 and 3, and sentenced on Count 3.

conviction having been affirmed, any bail pending appeal is terminated.   Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES,   JUDGE

PATRICIA A. BLACKMON, P.J., and
MELODY J. STEWART, J., CONCUR