**[Cite as *State v. Trivett*, 2018-Ohio-3926.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

STATE OF OHIO

    Appellee

    v.

MELANIE TRIVETT

    Appellant

C.A. No.     17CA0032-M
             17CA0049-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.     14CR0285

DECISION AND JOURNAL ENTRY

Dated: September 28, 2018

---

CARR, Judge.

**{¶1}** Appellant, Melanie Trivett, appeals her conviction for endangering children. This Court affirms.

I.

**{¶2}** Trivett's three-year-old son, T.T., ingested Wellbutrin and was treated at Akron Children's Hospital for symptoms characterized as "serotonin syndrome" that resulted. At the time, Trivett had been prescribed Wellbutrin to combat depression. In the days following the incident, Trivett speculated about how T.T. may have obtained the medication, but she could not explain with any certainty how it actually happened. Ten days later, two detectives from the Medina Police Department interviewed Trivett at the police station, where they also obtained a written statement from her.

**{¶3}** Trivett was charged with felonious assault in violation of R.C. 2903.11(A)(1), endangering children in violation of R.C. 2919.22(A), and tampering with evidence in violation

of R.C. 2921.12(A)(2). She moved to suppress all of the statements that she made during her interview and the written statement that she made after the conclusion of the interview, arguing that she was in custody during the interview, but the police did not inform her of her rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The trial court concluded that Trivett was not in custody for purposes of *Miranda* and denied the motion. The case proceeded to trial, and a jury found Trivett guilty of endangering children. The trial court sentenced her to three years of community control, and Trivett appealed. This Court reversed with respect to the trial court's decision that denied the motion to suppress only, noting that the trial court's findings of fact were incomplete. *State v. Trivett*, 9th Dist. Medina No. 15CA0041-M, 2016-Ohio-8204, ¶ 9. Specifically, this Court observed that because the trial court made no determination with respect to facts essential to disposition of the motion, this Court could not determine to what extent they had been considered. *Id*. at ¶ 8. Consequently, this Court reversed so that the trial court could address the motion to suppress in light of that conclusion. *Id*. at ¶ 9.

{¶4} On remand, the trial court denied Trivett's motion to suppress again. Trivett then filed this appeal, challenging the trial court's second ruling on her motion to suppress and her conviction for endangering children.

II.

ASSIGNMENT OF ERROR I

> ON REMAND, THE TRIAL COURT ERRED AND DENIED [TRIVETT] THE PROTECTIONS AFFORDED UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY OVERRULING [TRIVETT'S] MOTION TO SUPPRESS STATEMENTS[.]

{¶5} Trivett's first assignment of error argues that the trial court erred by denying her motion to suppress because she was in custody during the course of her interview with police, but she was not provided with the procedural safeguards required by *Miranda.* We disagree.

{¶6} An appellate court's review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court acts as the trier of fact during a suppression hearing and is best equipped to evaluate the credibility of witnesses and resolve questions of fact. *Id*.; *State v. Hopfer*, 112 Ohio App.3d 521, 548 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653 (4th Dist.1994). Consequently, this Court accepts a trial court's findings of fact if supported by competent, credible evidence. *Burnside* at ¶ 8. Once we have determined that the trial court's factual findings are supported by the evidence, we consider the trial court's legal conclusions de novo. In other words, we accept the trial court's findings of fact as true, and "must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id*., citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist.1997).

{¶7} On remand, the trial court issued a decision that contains a thorough discussion of its findings of fact. Trivett has not argued that the trial court's findings are unsupported by the record, and this Court concludes that the trial court's findings are supported by competent, credible evidence.

{¶8} The trial court noted that before police officers drove Trivett to the police station, she asked whether they wanted her to drive separately, but did not state that she wished to drive herself to the station. The trial court found that Trivett entered and exited the unmarked vehicle on her own, that the vehicle itself lacked backseat restraints typically found in police cruisers, and that the vehicle's built-in safety features prevented both Trivett and the detective who also rode in the backseat from unlocking their doors before the driver's own locks disengaged. The trial court wrote that Trivett was never placed in handcuffs, was at times unsupervised during the

interview, did not ask to end the interview at any time, and, even when both officers were present in the interview room, had a clear path of egress. According to the trial court, the door to the interview room remained open at all times. The trial court noted that the officers did require Trivett to complete a written statement at the police station instead of taking it home to complete, but also noted that it clearly advised Trivett that a written statement was voluntary, that she had the right to consult an attorney, and that the statement could be used as evidence against her. The trial court also found that Detective Gross, who participated in the interview, was aware that Trivett had been taking painkillers, but observed no indications that Trivett was impaired.

{¶9} *Miranda* warnings "are intended to protect a suspect from the coercive pressure present during a custodial interrogation." *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, ¶ 9, citing *Miranda*, 384 U.S. at 469. "[C]ustodial interrogation" occurs when law enforcement officers initiate questioning after an individual has been taken into custody "or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444. In every case, the inquiry is fact-specific. *State v. Myers*, Slip Opinion No. 2018-Ohio-1903, ¶ 57. "In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983), citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Relevant considerations include the location and duration of questioning, statements made during an interview, whether physical restraints

were used, and whether the individual was released after questioning. *Howes v. Fields*, 565 U.S. 499, 509 (2012). On the other hand, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

{¶10} Trivett has argued that she was in custody because she was taken to the police station under compulsion, questioned without access to egress from the building, and forced to remain at the police station to complete a written statement. We disagree.

{¶11} According to the trial court's findings, which were supported by competent, credible evidence from the record, Trivett did not ask to drive herself to the police station; rather, she inquired about whether the officers wanted her to drive or wanted her to ride with them. Contrary to Trivett's statement that "she was escorted out of her home in arrestee style—with one officer in front and one behind[,]" the trial court found that Trivett "walk[ed] down the stairs and out of the apartment building in front of both detectives." While Trivett maintains that "[s]he was placed in the back of a police car with a door lock system that prevented her exit without action by the officers[,]" the trial court found that, in context, the officers' vehicle included standard safety features:

> Upon arrival at the police station, the back seat passengers were unable to unlock their doors and exit the vehicle until the driver unlocked the doors due to safety features contained on the vehicle. The Court notes that this safety feature is not the same as a feature commonly referred to as child safety locks. A child safety lock is engaged prior to closing the door by accessing a switch on the inside of the door frame. Child safety locks are designed to ensure that children cannot exit a vehicle from the inside when the mechanism is engaged, even when the doors are unlocked—instead requiring someone to open the door from the outside of the vehicle. In this case, the child safety locks were not engaged. Instead, the built-in safety features on the vehicle unlock the rear doors when the car is in park, the driver opens his or her door and presses the unlock button. To the extent that Trivett and Detective Gross were initially unable to unlock the rear doors and exit

the vehicle when they arrived at the station, this was due to the fact that Detective Grusendorf had not yet unlocked the doors and was not a result of engaged child safety locks.

{¶12} The trial court acknowledged that the officers interviewed Trivett in a "small" room "located at a spot in the building furthest away from the building exit." Nonetheless, Trivett was left unsupervised in the interview room with the door open at times; throughout the interview, the door remained open and Trivett had a clear path by which she could exit the room. After approximately two hours, Detective Gross requested releases to obtain her children's medical records. When Trivett became visibly upset, she was informed that she was "not going to jail that day." The trial court found that when Trivett asked if she could complete a written statement at home, the officers told her that it should be filled out at the station. At the same time, however, the form provided by the officers for the written statement informed Trivett that a statement was voluntary, that she had the right to talk to counsel, and that any statement she made could be used as evidence against her. Trivett completed the written statement.

{¶13} Although Trivett emphasizes that the circumstances that surrounded her interview were potentially coercive, it is not the potential for a coercive environment, in isolation, that requires *Miranda* warnings:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

(Emphasis omitted.) *Mathiason*, 429 U.S. at 495. The circumstances surrounding Trivett's statement to police demonstrate that a reasonable person in her position would not have believed

herself to be in custody. Trivett travelled to the police station voluntarily, without compulsion on the part of the detectives. No restraints were placed upon her at any time, either before or during the interview, nor was her freedom of movement restricted.

{¶14} The trial court did not err by denying Trivett's motion to suppress. Her first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE VERDICT AND JUDGMENT BELOW WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND VIOLATED [TRIVETT'S] RIGHT TO DUE PROCESS OF LAW.

{¶15} Although framed as a challenge to the weight of the evidence supporting her conviction, the substance of Trivett's second assignment of error challenges the sufficiency of the evidence. Specifically, she has argued that because there is no evidence that establishes how T.T. ingested the medication, there is no evidence that could lead a jury to find her guilty. We disagree.

{¶16} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins* at 390 (Cook, J., concurring). In reviewing the evidence, we do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The State's evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. *Id*.

{¶17} R.C. 2919.22(A), which prohibits endangering children, provides that "No person, who is the parent * * * of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." Endangering children is a third-degree felony when it results in serious physical harm to the victim. R.C. 2919.22(E)(2)(c). A "substantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "Serious physical harm" includes physical harm that carries a substantial risk of death, involves partial or total permanent incapacity or substantial temporary incapacity, involves permanent disfigurement or substantial temporary disfigurement, or involves "acute pain of such duration as to result in substantial suffering" or "any degree of prolonged or intractable pain." R.C. 2901.01(A)(5).

{¶18} The mental state of recklessness is an essential element of endangering children. *State v. McGee*, 79 Ohio St.3d 193 (1997), syllabus. "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." Former R.C. 2901.22(C).

{¶19} It is uncontested that Trivett had been prescribed Wellbutrin, that T.T. ingested Wellbutrin, and that T.T. was in Trivett's care at the time of the incident. Although there was no testimony at trial that specifically identified the means by which T.T. ingested the Wellbutrin, there is sufficient circumstantial evidence to allow the trier of fact to reasonably conclude that Trivett recklessly created a substantial risk to T.T. by administering the medication to him or by allowing him to ingest it. Similarly, the evidence at trial clearly established that substantial harm

to T.T. resulted—namely, that he was life flighted to Akron Children's Hospital, where he spent three days in the pediatric intensive care unit.

{¶20} Dr. Michael Forbes, who treated T.T. at Akron Children's Hospital, described the effects of serotonin syndrome and opined that serotonin syndrome can prove fatal. He also testified that it is not uncommon for children to swallow pills the size of a Wellbutrin tablet. Trivett's mother testified that Trivett kept her medication in a medicine strip that snapped closed. She also explained that the medicine strip was "not extremely secure" and that, as she helped to load her daughter's car to return to Akron, five days' worth of pills spilled from a bag that held children's clothing onto the rear floor of Trivett's Jeep. Trivett's mother explained that although it was dark, she picked the spilled pills up from the floor and put them back in the container. She testified that she did not check to see whether any pills spilled into the clothing in the bag and that she forgot to mention the incident to her daughter.

{¶21} Trivett's estranged husband, Matthew Trivett, testified that he was separated from Trivett at the time of the incident, but that she had returned home with the intention of reconciliation. Mr. Trivett testified that shortly before Trivett arrived with their two children, he thoroughly cleaned their apartment and found no loose medication. After the incident, however, Mr. Trivett found pills under a pile of clothing and in other places in T.T.'s bedroom.

{¶22} "Circumstantial evidence and direct evidence inherently possess the same probative value[.]" *Jenks*, 61 Ohio St.3d 259, at paragraph one of the syllabus. Consequently, this testimony that Trivett maintained her medication in an unsecure container and that Mr. Trivett identified pills on the floor of T.T.'s room after Trivett's arrival, but not before, is sufficient for a trier of fact to reasonably conclude that the elements of endangering children have been proved beyond a reasonable doubt.

{¶23} Alternatively, a trier of fact could reasonably have concluded that Trivett administered the medication to T.T. According to Detective Grusendorf's recollection, Trivett considered medication to be among her hobbies, and she expressed frustration at her sons' disrupted sleep. He also testified that she had administered melatonin to her children on one occasion to induce sleep. Similarly, Trivett's mother-in-law testified that on another occasion, Trivett expressed concern that T.T. would not awaken after a dose of Benadryl. This circumstantial evidence, in conjunction with the wide ranging theories regarding the overdose that were posited by Trivett, is sufficient to demonstrate that the elements of endangering children were established in this case.

{¶24} Trivett's second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

THE VERDICT AND JUDGMENT BELOW WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶25} Trivett's final assignment of error is that her conviction for endangering children is against the manifest weight of the evidence. We disagree.

{¶26} When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶27} The State advanced two theories of its case against Trivett at trial: that T.T. accidentally ingested Welbutrin that had been recklessly maintained by Trivett or that Trivett provided the Welbutrin to T.T. in an effort to help him to sleep. Trivett suggests that her conviction is against the manifest weight of the evidence because the State could not establish with certainty how T.T. ingested the Welbutrin and because plausible theories that did not involve reckless conduct on the part of Trivett were mentioned at trial. We disagree.

{¶28} It is undisputed that T.T. suffered from an overdose of Welbutrin. His father testified that he was in the pediatric intensive care unit for three days. His paternal grandfather, who was present in the pediatric intensive care unit after T.T. was life flighted to Akron Children's Hospital, described the severity of his condition:

> He was just out of control. The poor boy, there was just nobody home. He was convulsing and they were just trying to hold him down. [Trivett's] mom kept getting in the crib with him trying to hold him down.

T.T.'s paternal grandmother concurred: "He was not coherent, hallucinating, shaking, his eyes were rolling back. * * * I was terrified." According to the grandfather, Trivett offered "[n]umerous" explanations for the situation that changed "[e]very time [he] talked to her[.]"

{¶29} Other witnesses at trial also recounted that Trivett offered several possible contradictory explanations for T.T.'s overdose. For example, Detective Joshua Grusendorf recalled that Trivett's suggested timeframe for the overdose was that she returned to her car after T.T. went to bed but before he awakened to retrieve her medication box and that she took her medications after he awakened. Detective Grusendorf testified that Trivett was adamant that T.T. could not have accessed the medication prior to that time because it was in the car. At other points, however, Detective Grusendorf noted that Trivett speculated that T.T. may have accessed her medication earlier in the day. According to Detective Grusendorf, Trivett also speculated

that she might have backwashed a dissolved pill into her own beverage, which T.T. then ingested, or that he had found one of her pills and slipped it into his own sippy cup. He testified that Trivett soon retreated from each of these explanations in favor of another:

> Trivett believed that [T.T.] had gotten in to her medication [during a previous visit] and had subsequently hid the medication in his room prior to them leaving to go back to Michigan and believed that when they returned on the 7th, that he had retrieved the medication from his room.

Stephanie Reau, of Medina County Child and Family Services, testified that Trivett proposed the same theory to her:

> [S]he said that the month prior she was living at her mother's house with the boys and she was coming home back to Medina on the weekends and she thought maybe the weekend prior they had moved back home to Medina that [T.T.] possibly got the medication out of her bag and hid them in his room and so when they got back the next week to officially move back in to the home, he went and got the pills and took them.

**{¶30}** At the same time, however, Detective Grusendorf testified that Trivett insisted that T.T. would not have ingested one of her pills on his own:

> Q:   What about him swallowing the pill? Did she indicate whether or not [T.T.] would have swallowed the pill on his own?
>
> A:   She stated that he would not have done that due to the bitterness of the pill, that [T.T.] doesn't like bitter-tasting things and would automatically spit them out. She believed at that time that we were speaking with her that that was not possible."

Mr. Trivett expressed doubts that T.T. could have ingested a pill of the size at issue, but expressed confidence that he would have spit out a bitter tasting pill nonetheless.

**{¶31}** Mr. Trivett's testimony further contradicts Trivett's theory that T.T. concealed the medication and ingested it later on his own. Mr. Trivett testified that he thoroughly cleaned the apartment before Trivett arrived, which indicates that she is the only plausible source of the medication that T.T. ingested. He also testified that he found pills hidden in various places in the boys' bedroom when he straightened up the room during T.T.'s hospitalization but, notably, he

described individual pills concealed underneath items throughout the room rather than a cluster of pills or individual pills haphazardly placed. Finally, he recalled that about two weeks after the incident—and after the apartment had been thoroughly cleaned—Trivett claimed to have found a single, half-consumed pill near the entrance to the boys' bedroom, but she flushed it down the toilet immediately without showing it to anyone.

{¶32} Trivett's mother explained that T.T. may have acquired the medication after some of her daughter's pills spilled onto the rear floor of her Jeep, but she acknowledged that she did not remember to tell her daughter about the spill, nor did she speak up in her daughter's defense when Trivett was asked how T.T. obtained the medication. Even if her testimony is credited despite her failure to mention it at the hospital or to police, that testimony was inconsistent with Detective Grusendorf's recollection of Trivett's timeline, according to which the bag that contained her medication remained in the car until after T.T. went to bed.

{¶33} Witnesses confirmed that Trivett suffered from depression and that her children's disrupted sleep was a source of frustration to her. At the same time, Trivett informed Detective Grusendorf that "medications were somewhat of a hobby for her[.]" Although Trivett denied that she had ever given T.T. Benadryl for reasons other than the allergies for which it had been prescribed, her mother-in-law testified that she had received a call from Trivett in the past expressing concern that she might have given T.T. too much Benadryl because it was difficult to wake him. In a similar vein, Detective Grusendorf testified that Trivett acknowledged that she had dissolved Melatonin in both of her children's sippy cups on one occasion because she "needed them to sleep[.]" According to his testimony, Trivett then had difficulty waking one of the children and sought advice from her in-laws.

**{¶34}** Although the evidence at trial was circumstantial, it is not—as noted above—of less probative value. *Jenks*, 61 Ohio St.3d 259 at paragraph one of the syllabus. The testimony at trial conflicted at various points and a clear cut explanation of T.T.'s overdose was not established, but we cannot conclude that this is the exceptional case in which the evidence at trial weighs heavily against the conviction. Trivett's third assignment of error is overruled.

III.

**{¶35}** Trivett's assignments of error are overruled, and the judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SCHAFER, P. J.
TEODOSIO, J.
CONCUR.


APPEARANCES:

ROGER M. BUNDY, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.