[Cite as *State v. Sheets*, 2025-Ohio-5158.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 23CA4055 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | |
| | : | |
| JUSTIN SHEETS, | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| Defendant-Appellant. | : | |
| | : | |

_____

APPEARANCES:

Valerie Webb, Portsmouth, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay S. Willis, Assistant Scioto County Prosecutor, Portsmouth, Ohio, for appellee.

_____

Smith, P.J.

{¶1} Appellant, Justin Sheets ("Sheets"), appeals the judgment of the Scioto County Court of Common Pleas after a jury found him guilty of three counts of a four-count indictment. The charges arose from the death of K.F., ten and one-half months old, who died from an overdose of fentanyl and fluro-fentanyl on September 17, 2021. Sheets was convicted of involuntary manslaughter, endangering children, and possession of a fentanyl-related compound. On appeal, Sheets raises two assignments of error contending that 1) his convictions are not

supported by legally sufficient evidence and, 2) that his convictions are against the manifest weight of the evidence. Because we find no merit to either assignment of error Sheets raises, they are both overruled and the judgment of the trial court is affirmed.

## BACKGROUND

{¶2} On January 10, 2023, Sheets was indicted by a Scioto County Grand Jury, along with co-defendant Amye Knott ("Knott"), on a superseding indictment alleging Count One, involuntary manslaughter, a first-degree felony in violation of R.C. 2903.04(A)(C); Count Two, endangering children, a third-degree felony in violation of R.C. 2919.22(A)(E)(2)(c); Count Three, possession of a fentanyl-related compound, a fifth-degree felony in violation of R.C. 2925.11(A)(C)(11)(a) and Count Four, aggravated possession of drugs (methamphetamine), a fifth-degree felony in violation of R.C. 2925.11(A)(C)(1)(a). The original indictment involved defendants Robert Filius ("Filius") and Michaela Hupp ("Hupp"). The indictments arose from circumstances occurring on September 17, 2021, resulting in the death of K.F.

{¶3} K.F., along with her two small siblings, resided at Knott's and Sheets' residence in Portsmouth with Filius and Hupp. Sheets, who was Knott's fiancé, was K.F.'s maternal grandfather, while Filius and Hupp were K.F.'s parents. On September 17, 2021, Knott called 911 exclaiming that K.F. was not breathing and

unresponsive. Although first responders arrived at the residence within minutes, they were not able to revive K.F., and she was pronounced deceased shortly thereafter. At the time first responders arrived at the scene, Knott and Sheets were at the residence, Hupp was at a nearby park with the other children, and Filius had run to the park to get Hupp.

{¶4} Police interviewed the residents of the approximately 1,000-square-foot home. They learned from the residents that K.F. was able to crawl around on the floor, climb on things, and pull herself up to a standing position. They further learned that K.F. was in the bedroom with Sheets and Knott while Hupp and Filius were in the living room. Roughly ten minutes after the child went into her grandparents' bedroom, Sheets carried K.F. to the living room where he sat her on the floor. The child crawled to the kitchen, where she appeared to be in a "daze" and shortly thereafter began falling asleep, as if "nodding out." The parents thought the child was simply tired because she had been up teething most of the night before. Hupp therefore put the child down for a nap.

{¶5} When Filius went in to check on K.F. at 6:30 p.m., the child's lips were blue, her eyes were closed, and she was stiff. Filius began screaming and woke up Sheets and Knott who were sleeping in their bedroom at the time. Police discovered Filius ran to the park to get Hupp and Knott called 911. Knott's phone call to 911 had been left active so several minutes after Filius left the residence,

one can hear Knott and Sheets on the call.  When listening to the entire call, police heard Sheets, saying, "I'm fucking fucked," and statements such as "I fucking killed her, Amye," and "I fucked up."

{¶6}   An autopsy revealed that the child had nothing wrong congenitally, no developmental problems, and no trauma.  The only abnormal findings were that the lungs were heavy and contained frothy, bloody fluid.  The toxicology screening revealed that the child had fentanyl and fluro-fentanyl in her system, and intoxication due to those substances was determined to be the cause of death.

{¶7}   Interviews with the four adult occupants of the residence, consent searches of the residence, and text messages seized from Knott's and Filius' phones revealed rampant drug use and abuse in the home involving fentanyl, methamphetamine, methadone, heroin, and marijuana.  Sheets and Knott were aware of Filius and Hupp's use of illicit substances.  Knott and Sheets avoided drug screens, nodded out frequently, and showed other signs of opiate abuse.  In addition to finding evidence that drug paraphernalia was left within the reach of small children, the investigation also revealed that drugs had been accessible to K.F. on at least one or two other occasions.

{¶8}   The investigation revealed the parents, Filius and Hupp, were using methamphetamine and marijuana, but not fentanyl.  The child had no methamphetamine in her system.  Police also discovered through interviews and

texts that Sheets and Knott (rather than Filius and Hupp) primarily used heroin and fentanyl. Knott also had Narcan available, which is used for opiate overdose, but she did not use it that evening.

{¶9} On the evening of the incident, law enforcement did not know the child's cause of death. They performed a walk-through of the residence to see whether there were drugs in plain view and later gained consent from all adults in the home to search the common areas and each of the two bedrooms. Law enforcement did not find any drugs either time, but testimony at trial was that they did not conduct a thorough search by, for example, lifting up the carpet. After law enforcement left that day, Hupp went into the house and Sheets lifted up his mattress in the grandparents' bedroom. At that time, Hupp saw that Sheets had hidden a cell phone, a syringe, and "dope," or white powder in a bag. The State also presented testimony from law enforcement familiar with drug abuse that fentanyl is generally a white-powdered substance.

{¶10} Sheets and Knott were tried together in a four-day jury trial, from December 11-14, 2023. The State called 13 witnesses including Filius and Hupp. The trial court also admitted over 80 exhibits.

{¶11} The jury convicted both defendants of the first three counts of the indictment and found them not guilty of Count 4, aggravated possession of drugs

(methamphetamine).  The trial court imposed an indefinite prison term of 10-15 years.  This timely appeal followed.

ASSIGNMENTS OF ERROR

I.    APPELLANT'S CONVICTIONS SHOULD BE REVERSED BECAUSE THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE FINDING OF GUILT BEYOND A REASONABLE DOUBT.

II.   APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND SHOULD BE REVERSED.

ASSIGNMENTS OF ERROR

{¶12}   For ease of analysis, we address Sheets' assignments of error in conjunction with one another.  In his first assignment of error, Sheets asserts that his convictions for involuntary manslaughter, endangering children, and possession of drugs are not supported by legally sufficient evidence.  In his second assignment of error he contends that his convictions are against the manifest weight of the evidence.

Standard of Review

{¶13}   A claim of insufficient evidence invokes a due process concern and raises a question of whether the evidence is legally sufficient to support the verdict as a matter of law.  *See State v. Thompkins*, 78 Ohio St.3d 380, 386, (1997).  "Whether the evidence is legally sufficient to sustain a verdict is a question of

law." *Id.* "Therefore, our review is de novo." *State v. Groce*, 2020-Ohio-6671, ¶ 7, citing *In re J.V.*, 2012-Ohio-4961, ¶ 3.

{¶14} When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support the finding of guilt beyond a reasonable doubt. *Thompkins* at syllabus. The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390 (Cook, J., concurring).

{¶15} Thus, when reviewing a sufficiency-of-the-evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *See State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477 (1993). A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162 (2001), citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶16}  However, when an appellate court considers a claim that a

conviction is against the manifest weight of the evidence, the court must dutifully

examine the entire record, weigh the evidence and all reasonable inferences, and

consider the witness credibility.  *See State v. Dean*, 2015-Ohio-4347, ¶ 151; citing

*State v. Thompkins, supra*, at 387.  A reviewing court must bear in mind, however,

that credibility generally is an issue for the trier of fact to resolve.  *See State v.*

*Issa*, 93 Ohio St.3d 49, 67 (2001); *State v. Murphy*, 2008-Ohio-1744, ¶ 31 (4th

Dist.).  " ' "Because the trier of fact sees and hears the witnesses and is particularly

competent to decide 'whether, and to what extent, to credit the testimony of

particular witnesses,' we must afford substantial deference to its determinations of

credibility." ' "  *State v. Kuntz*, 2024-Ohio-1680, ¶ 20 (4th Dist.), quoting

*Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20, quoting *State v. Konya*, 2006-Ohio-

6312, ¶ 6 (2d Dist.), in turn quoting *State v. Lawson*, 1997 WL 476684 (2d Dist.

Aug. 22, 1997).

{¶17}  As the court explained in *Eastley v. Volkman*, 2012-Ohio-2179:

> " '[I]n determining whether the judgment below is manifestly against
> the weight of the evidence, every reasonable intendment must be made
> in favor of the judgment and the finding of facts.
>
> * * *
>
> If the evidence is susceptible of more than one construction, the
> reviewing court is bound to give it that interpretation which is
> consistent with the verdict and judgment, most favorable to sustaining
> the verdict and judgment.' "

*Eastley, supra* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), in turn quoting 5 Ohio Jurisprudence 3d, Appellate Review, § 60, 191-192 (1978).

{¶18}   Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact-finder as long as a rational basis exists in the record for its decision.  *See State v. Picklesimer*, 2012-Ohio-1282, ¶ 24 (4th Dist.); *see also State v. Howard*, 2007-Ohio-6331, ¶ 6 (4th Dist.) ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight.").

{¶19}   Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).  *See also Thompkins, supra*, at 387.  If the prosecution presented substantial credible evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence.  *See State v. Eley*, 56 Ohio St.2d 169 (1978), syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith*, 80 Ohio St.3d 89

(1997); *see also Eastley* at ¶ 12 and *Thompkins* at 387 (explaining that a judgment is not against the manifest weight of the evidence when "the greater amount of credible evidence" supports it). Thus, " '[w]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony.' " *State v. Cooper*, 2007-Ohio-1186, ¶ 17 (4th Dist.), quoting *State v. Mason*, 2003-Ohio-5785, ¶ 17 (9th Dist.). Instead, a reviewing court should find a conviction against the manifest weight of the evidence only in the " ' "exceptional case in which the evidence weighs heavily against the conviction." ' " *State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000), quoting *Thompkins* at 387, in turn quoting *Martin* at 175.

{¶20} Further, the State may prove its case by circumstantial evidence:

> It is well-established * * * that "a defendant may be convicted solely on the basis of circumstantial evidence." *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). "Circumstantial evidence and direct evidence inherently possess the same probating value." *Jenks*, paragraph one of the syllabus. "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. * * * ' " *Nicely*, 39 Ohio St.3d at 150, quoting Black's Law Dictionary (5 Ed.1979) 221.

*State v. Wickersham*, 2015-Ohio-2756, ¶ 39 (4th Dist.); *see also State v. Barnes,* 2020-Ohio-3943, ¶ 23-24 (4th Dist.).

{¶21} Additionally, "[w]hen an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes

a finding that sufficient evidence supports the conviction." *Wickersham*, at ¶ 27, citing *State v. Pollitt,* 2010-Ohio-2556, ¶ 15 (4th Dist.). A determination that a conviction is not against the manifest weight of the evidence is therefore dispositive of the issue of whether the evidence is sufficient to sustain a conviction. *Id.*, citing *State v. Lombardi,* 2005-Ohio-4942, ¶ 9 (9th Dist.). Therefore, in the instant case*,* we consider Sheets' argument that his convictions are against the manifest weight of the evidence.

Legal Analysis

{¶22} Here, Sheets was convicted of involuntary manslaughter, endangering children, and possession of drugs. R.C. 2903.04(A), involuntary manslaughter, states, "[n]o person shall cause the death of another . . . as a proximate result of the offender's committing or attempting to commit a felony." "The culpable mental state of involuntary manslaughter is supplied by the underlying offense." *State v. Pinkerman,* 2024-Ohio-1150, ¶ 35, quoting *State v. Johnson,* 2011-Ohio-1919, ¶ 54 (8th Dist.) and citing *State v. Brown*, 2018-Ohio-899, ¶ 11 (3d Dist.). The indictment in the instant case alleges that Sheets committed involuntary manslaughter by causing the victim's death as a proximate result of (1) endangering children or (2) possession of drugs. The jury verdict form in the case at bar indicates Sheets committed involuntary manslaughter under both predicate felony offenses.. As a result, we will first consider whether Sheets

committed the offenses of endangering children and possession of drugs, and if so, if K.F.'s death was a proximate result of his committing those offenses.

{¶23}   At trial the State first presented the testimony of Lieutenant Joshua Justice, a 20-year veteran of the Portsmouth Police Department who had extensive experience in drug investigations. Justice testified to the properties of fentanyl (that it is a white or gray powder). Justice explained to the jury the effects of the drug, including lethargy and nodding off, and also explained that persons who are exposed to fentanyl are affected very quickly by the drug. In addition, Justice described the use of Narcan and how it works as a life-saving measure in the case of opiate overdose.

{¶24}   Justice testified that on September 17, 2021, he responded to a 911 call of a young infant not breathing and unresponsive, who was probably deceased. Two officers were dispatched to the scene of a single-story dwelling at 1677 Robinson Avenue in Portsmouth, and Justice went to supervise. When Justice arrived at the scene, Sheets and Knott were there and the child was in the squad already. Knott told Justice that Filius had run to Mound Park to get Hupp.

{¶25}   Justice transported Sheets and Knott to the department and other officers provided security at the residence until the detective arrived. Officer (now detective) Croasmun transported Filius and Hupp to the department.

{¶26}   Next to testify was Officer Tyler Spriggs.  Spriggs testified that he and Officer Croasmun were dispatched to a 911 call regarding a child "not breathing" and they responded within a "couple of minutes at the most."  Spriggs also explained that, in his experience, he is regularly called out regarding overdoses and that he responds with the fire department.  He also explained that persons who ingest opiates usually "nod off, can't focus," and "get real sleepy."

{¶27}   When Spriggs arrived on scene, he saw a medic from the fire department carrying a limp child out of the house.  Spriggs cleared the house, did a protective sweep, and started talking to the witnesses on the scene to get a general idea of what happened.  Sheets and Knott were sitting on the porch and crying.

{¶28}   Spriggs testified that Sheets and Knott said they were in the bedroom sleeping when they overhead Filius scream that the infant was not breathing.  Both Sheets and Knott told Spriggs that Filius ran to Mound Park to get Hupp, who was there with her other two children.  Sheets claimed he was trying to do CPR as they called 911.

{¶29}   Spriggs saw Filius and Hupp running down the street.  Filius told Spriggs the infant had been laid down for a nap about an hour and a half before.  Filius said when he returned to get the infant she wasn't responding to him so he started rubbing her back and noticed she wasn't breathing.  Filius said that's when

"they" called 911 and Filius went to get his girlfriend, Hupp. Spriggs noted that Hupp was "hysterical" and she did not talk a lot at the time.

{¶30} The State next called Officer Stacey Croasmun to the witness stand. Croasmun arrived at the same time as Spriggs and let the medics go in first. Sheets and Knott were at the house when she arrived. Croasmun said the child was "absolutely limp" when the medics took her into the squad. Croasmun asked Sheets and Knott what room the child was in so she could give information to the medics. One of the grandparents told Croasmun that the child was possibly given melatonin, so Croasmun relayed that to the paramedics. Sheets and Knott also told Croasmun that Hupp had gone to Mound Park with her older children and after finding K.F., Filius had gone to the park to get Hupp. When Filius returned with Hupp, he said he had to get Hupp because he didn't have any way to get in contact with her.

{¶31} Croasmun took Sheets and Knott to the department, and while there, Croasmun recalled that Sheets' demeanor was "odd." At some point, Sheets started to "nod in and out" when the three were in the room. In other words, Croasmun thought Sheets appeared to be under the influence of an opiate or depressant. Knott was quietly sobbing. On cross-examination, Croasmun acknowledged that it was possible that Sheets was just "tired."

{¶32}   Scott Osborne, a paramedic and medic, also testified as a lay witness and as a designated expert in critical paramedic care.  He also explained the effects of opiate use (e.g., nodding off and pinpoint pupils).

{¶33}   Osborne was dispatched at 6:33 and arrived at 6:35.  When he arrived at Robinson Avenue he noticed there were a couple of people who didn't appear to be reacting much but others that were obviously distraught.

{¶34}   When Osborne had contact with the infant, he found no heartbeat or respirations.  He found no signs of trauma on the child.  He saw no evidence of SIDS or a co-sleeping death.  There were signs of lividity in the right side of the face and left foot.  He explained that in his experience he had never seen lividity occur within 30 minutes.  He determined the heart had been inactive for some time. The child was therefore pronounced deceased by medical personnel.

{¶35}   Detective Charles Crapyou arrived about 10 minutes after the 911 call.  He learned the child was deceased and he took photographs.  One of the items he saw sitting in plain sight in the living room of the residence was a drink box container that had been altered to smoke drugs.  Infant's things were nearby the table the drink box was sitting on.  After Crapyou eventually obtained Knott's and Sheets' consent to search, marijuana paraphernalia was found in their bedroom.

{¶36} Crapyou testified that Knott's phone, which was found lying in the living room, was the phone used to call 911. When Crapyou picked the phone up the 911 call was still open and running so he obtained the 911 tape. Crapyou found out from the phone call that Filius had left. Crapyou heard the 911 call with a male's voice that says, "I'm fucking fucked," and "I effing killed her," or something to the essence of that.

{¶37} In addition to the first responders and investigators, the State called the child's father, Robert Filius, to testify. Filius was indicted in the same way as Sheets and Knott and pled guilty to endangering children, possession of a fentanyl-related compound, and aggravated possession of drugs. In exchange for testifying truthfully he received a 4-year, 9-month sentence, with judicial release after half.

{¶38} Filius testified that he was a methamphetamine and marijuana user. He said he saw incidents of Sheets and Knott under the influence of fentanyl multiple times while he was living at the Robinson Avenue residence (between February-September, 2021). Filius saw bottles of methadone lying around the house. He also stated that Sheets and Knott paid the rent and utilities at the home.

{¶39} At some point, Filius found a plate with brown powder in Sheets' and Knott's bedroom and expressed concerns to Hupp that they were using heroin in the home. From text messages, it appears this occurred on August 20, 2021.

{¶40}   The State introduced various text messages (primarily between July 2021 and September 2021) between Filius and Hupp.  They demonstrated ongoing drug use by Sheets and Knott, primarily of fentanyl.  Filius testified that Sheets and Knott primarily used fentanyl.  Further, Filius told Hupp that Sheets and Knott at various times had passed out, sometimes in the bathroom, living room, or on the front porch.

{¶41}   In addition, on July 4, 2021, Filius found a "Tramadol" on the floor. On August 24, 2021, Filius found the child with a Neurontin in her mouth.  Filius saw the child chewing on something so he went over and got it out of her mouth and saw it was a pill.  Knott originally said, "it's not mine," but later that night asked if she could get the pill back.  Filius also testified that at the time of the incident, the child could crawl, get to a table and pull herself up, and was getting into whatever she could get into.

{¶42}   On September 16, 2021, Filius was up most of the night because the child was teething.  On the morning of the incident, the child finally went to sleep and Filius and Hupp did a line of meth.  Afterwards, both agreed they didn't want to do meth anymore so they flushed the bag down the toilet.  The child got up around 11:30 or 12:00 and Filius fed her.  It was a normal day so they did the routine.  Hupp had decided to take the children to the park at some point because it was her day off.  Sheets and Knott were gone most of the morning.

{¶43}   Sheets and Knott got back and went to their bedroom.  Hupp and Filius were sitting in the living room, the boys were doing crafts and eating at the table, and the child was crawling around the 1,000-square-foot house.  At one point, the child crawled into Sheets' and Knott's bedroom and Sheets carried her out about ten minutes later.  The child crawled into the kitchen in a "daze" and Filius brought the child back to the living room where she began "nodding out."  Her head "started to just nod down."  Hupp put the child down for a nap about 4:00 p.m.  Then Hupp went to the park with the other children.  Filius stayed with the child, waiting for her to wake up.  He checked on her about 6:30 p.m.

{¶44}   The child didn't wake up.  Filius walked over and started rubbing her back.  He picked up the child.  Her lips were blue, her eyes weren't waking up, she was stiff.  He left to go get Hupp.  The voice on the 911 call is Sheets.

{¶45}   Filius acknowledged that when he first talked to law enforcement he didn't tell them the whole truth.  He admitted he should have told the officers that he was high and had been using.  Everybody in the house was using.  However, he took a drug screen that evening, and when he did, it was positive for methamphetamine and "weed" — not fentanyl or heroin.

{¶46}   After Filius testified, Dr. Anna Catiglione, deputy coroner from Dayton and an expert in forensic pathology, testified that she found no trauma on the child.  She also found nothing congenitally or developmentally wrong with the

child.  The only abnormal finding the pathologist found was that the lungs were a little "heavy and congested."

{¶47}  After receiving the toxicology report, the pathologist determined that the cause of death was drug intoxication due to fentanyl and fluro-fentanyl in an amount that was the highest she had ever seen in any person, and most of the persons she has examined who overdosed were adults.  She also explained that in someone this size that has ingested this amount of the drug, the death would occur within minutes; however, the coroner was not able to determine how the drugs were ingested.

{¶48}  Heather Antonides, forensic toxicologist, was declared an expert in forensic toxicology.  She testified that the child's toxicology was positive for fentanyl, fluro-fentanyl, metabolites associated with those two drugs, and some acetaminophen.

{¶49}  Detective Kevin Metzler, a member of various drug enforcement agencies as well as the Portsmouth Police Department, testified regarding his obtaining of Knott's cell phone records.  He also buttressed the testimony of others about the signs of opiate/fentanyl use, that methamphetamine was an "upper" and fentanyl/heroin are "downers," and that most heroin users know that the drug they are using is actually fentanyl, *not* heroin.  He also explained the various terminology street users use when referring to drugs and drug transactions.

{¶50}   Metzler testified about several messages from Knott to Sheets from June 2021 through September 17, 2021.  They include information that all members of the home knew of drug use in the home, descriptions of Sheets and Knott wanting to get "high," trying to avoid drug screens because they'd test positive, arguments over hiding of drugs or who did more or less, and messages about saving drugs to use later.  In essence, these text messages Knott sent to Sheets show that both were using drugs and the other knew it.  In addition, a specific text shows that the individual Knott called "Jeremy" throughout the texts is someone from which Sheets and Knott procured the product, and the call log from Knott's phone shows a call was placed to Jeremy on September 16, 2021— the day before the incident.

{¶51}   The State called Michaela Hupp as a witness.  Like Filius, she was charged the same as the other co-defendants.  Also, like Filius, she pled to endangering children, possession of a fentanyl-related compound, and aggravated possession of drugs.

{¶52}   Hupp also testified that Sheets and Knott were fentanyl users, and she knew that because she had seen a plate with powder in their bedroom and needle caps lying around.

{¶53}   She also clarified that the child was ten and one-half months at the time and the child was crawling around, climbing, and almost ready to walk.  She

also said the other children living at Robinson Avenue were four and five years old at the time.

{¶54}   Hupp testified to the day's events essentially the same as Filius. Hupp also observed that after Sheets brought the child back from his and Knott's room and set the child on the floor, the child started "kind of falling asleep." Hupp didn't think anything of it because the child had been teething the night before and was up all night.  Hupp also admitted she had initially lied to law enforcement about using methamphetamines because she didn't want CPS to take her children and didn't want to rat out her father (Sheets).

{¶55}   Hupp also testified that after law enforcement had gone back into the house to search, she had gone with Sheets into his and Knott's room.  Sheets then lifted up the mattress on the couple's bed and Hupp saw that Sheets had hidden a phone, a syringe and a bag of "dope" (white powder in a bag) there.  In addition, Hupp said that she had later listened to the 911 call and the voices therein are Sheets and Knott.

{¶56}   Detective Sergeant Jodie Conkel testified.  Conkel testified similarly to other law enforcement except she added that when she got to the scene, "the smell of marijuana would knock you over; it was very strong."  She further testified that at first Sheets and Knott would not let law enforcement in their bedroom.  At the time they transported the occupants of the home to the

department, law enforcement did not have the information from the 911 call, nor the toxicology results which came in a couple months later.

{¶57} At the time of the interview, Conkel suspected that Sheets and Knott were under the influence because they both had pinpoint pupils, were very slow with their actions, had slurred speech, and their appearance was typical of someone who abused opiates. The investigation also revealed rent receipts and bills in Knott's name.

{¶58} Conkel described the searches of the residence and explained that they did not "tear the house apart and lift the carpet up" like they would typically do if part of a drug task force search. She also mentioned that Knott did not ask to take a drug test, but Knott asked if the child had been tested.

{¶59} Finally, Investigator Steven Timberlake testified. He testified to the circumstances surrounding Sheets' and Knott's second interviews that occurred after law enforcement had discovered the death was caused by fentanyl/fluro-fentanyl overdose. Knott's interview indicates that she and Sheets were using heroin and opiates in the weeks or months leading up to this incident. Knott admitted to using heroin and when asked if she used fentanyl specifically, she said "no one calls it that." Knott and Sheets both claimed that Sheets was out of town before the incident, but text messages obtained by law enforcement contradict that.

Endangering Children

{¶60}   The offense of endangering children relevant to the instant case, R.C.

2919.22(A), is defined in pertinent part as:

> No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age . . . shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

R.C. 2929.22(E)(2)(c) further provides that a violation of a division (A) that results

in serious physical harm to the child involved in the offense is a third-degree

felony.  "Substantial risk" is defined as "a strong possibility, as contrasted with a

remote or significant possibility, that a certain result may occur or that certain

circumstances may exist."  R.C. 2901.01(A)(8).  Additionally, the State must also

prove that appellant acted recklessly.  *State v. Sykes,* 2022-Ohio-865, ¶ 21 (6th

Dist.), citing *State v. McGee*, 79 Ohio St.3d 193, syllabus ("The existence of the

culpable mental state of recklessness is an essential element of the crime of

endangering children under R.C. 2919.22(A).").

{¶61}   The initial question is first, did Sheets commit the offense of

endangering children, a predicate offense to involuntary manslaughter?  On appeal,

Sheets does not challenge whether he is a person having custody or control, or a

person in loco parentis to the child.  Thus, the question is, did the State prove he

recklessly created a substantial risk to the health or safety of the child by violating

a duty of care, protection, or support?

{¶62} Sheets argues on appeal that the he and Knott were asleep in the bedroom when they heard Filius screaming and saying the child was not breathing. That came from the initial statement of Knott to the police when they arrived. However, the evidence shows that while Sheets and Knott may have been asleep at the time Filius discovered the child not breathing, they had been awake earlier in the day. Hupp, for example, testified that both had been out that morning. Hupp and Filius also testified that earlier in the day, the child had crawled into her grandparents' room where Sheets and Knott had used and kept drugs. The small size of the room is apparent from the photograph exhibits introduced by the State at trial.

{¶63} Approximately ten minutes after the child crawled into the room, Sheets carried the child out and placed her on the floor. It was after this time in her grandparents' room that the child looked "dazed" and started "falling asleep" or "nodding off." Only then did Hupp put her down for a nap because the parents thought she was sleepy from being up the night before.

{¶64} When Filius tried to rouse the child at approximately 6:30, or a few hours after she had been put down for the nap, he then yelled the baby was not breathing. At trial, both the paramedic and coroner testified that the child had been dead for some time before the first responders arrived on the scene. In addition, it is uncontroverted that Filius went to rouse the baby from a nap shortly before the

call was made. The paramedic testified that the child had to have been deceased for at least thirty minutes before he arrived on the scene because of the lividity. Further, the coroner and others testified that death from fentanyl overdose would have happened very soon after the child ingested or was exposed to the substance. As a result, Sheets was the adult in the home who was immediately with the child before she started to show the effects of what was later to be determined as fentanyl/fluro-fentanyl.

{¶65} There is a great deal of circumstantial evidence that numerous types of drugs were being used in the residence, and drug paraphernalia had been left within the reach of small children within the home. All of the members in the household, including Sheets, were aware that the child could crawl and get into things. There is also evidence that Sheets and Knott knew about the drugs in the home, and that it was Sheets and Knott who were the users of fentanyl. Knott admitted to Investigator Timberlake that she and Sheets were using opiates, or heroin (claiming no one calls it fentanyl), in the weeks before the incident.

{¶66} In *State v. Trivett,* the Ninth District upheld a conviction for third-degree felony endangering children when a three-year-old overdosed on his mother's prescription medication and suffered significant harm. 2018-Ohio-3926 (9th Dist.). On appeal, the defendant/mother raised the issue that her conviction was against the manifest weight of the evidence because there was no evidence of

how the child ingested the medication. *Trivett* at ¶ 15, 25. During the trial, the State presented evidence that the prescription medication could have either been deliberately given to the child by the defendant/mother, or he could have accidentally ingested it. *Id.*, at ¶ 19. Either way, the Ninth District held that even though the evidence at trial was circumstantial and a "clear cut explanation of [the child's] overdose was not established," the defendant/mother's conviction was still not against the manifest weight that defendant/mother had committed the offense of endangering children. *Id.*, at 34.

{¶67} In the instant case, like *Trivett*, it is clear that the child suffered an overdose from one particular drug. In *Trivett*, the defendant/mother was conclusively the one who had been prescribed the drug found in the child's system. Here, the grandparents were the only ones in the residence who used fentanyl and showed symptoms of opiate use on the evening of the incident. In contrast, the parents were using other drugs and showed signs of methamphetamine use—drugs which had not been found in the child's toxicology. The only significant difference between *Trivett* and this case is that overdose did not result in death. Further, even if Knott, and not Sheets, had been using the fentanyl, Sheets clearly knew that it was kept in the bedroom and recklessly failed to protect the child.

Possession of Drugs (Fentanyl)

{¶68}  The offense of possession of drugs relevant to the instant case, R.C. 2925.11, is defined in pertinent part as:  "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog."  This court has previously observed with regard to the "knowingly" element of the offense as follows:  " ' " 'A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist.' " ' "  *State v. Barnes,* 2020-Ohio-3943, ¶ 21 (4th Dist.), quoting *State v. Bailey*, 2015-Ohio-5483, ¶ 85 (4th Dist.), quoting *Wickersham*, 2015-Ohio-2756, ¶ 30, quoting R.C. 2901.22(B).  "Whether a defendant knowingly possessed a controlled substance 'is to be determined from all the attendant facts and circumstances available.' "  *State v. Hodges,* 2025-Ohio-2050, ¶ 34, quoting *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998); *accord State v. Corson*, 2015-Ohio-5332, ¶ 13 (4th Dist.).

{¶69}  " ' "[P]ossession" is defined as "having control over a thing or substance but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." ' "  *Barnes* at ¶ 22, quoting *State v. Gavin*, 2015-Ohio-2996, ¶ 35, quoting R.C. 2925.01(K).  " ' "Possession may be actual or constructive." ' "  *Id,* quoting Gavin at ¶ 35, quoting *State v. Moon*, 2009-Ohio-

4830, ¶ 19 (4th Dist.), citing *State v. Butler*, 42 Ohio St.3d 174, 175 (1989) ("[t]o constitute possession, it is sufficient that the defendant has constructive possession").

{¶70}  " ' "Actual possession exists when the circumstances indicate that an individual has or had an item within his immediate physical possession." ' " *Id*., quoting *Gavin* at ¶ 36, quoting *State v. Kingsland*, 2008-Ohio-4148, ¶ 13 (4th Dist.).  However, " ' "[c]onstructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." ' " *Id*., quoting *Gavin* at ¶ 36, quoting *State v. Hankerson*, 70 Ohio St.2d 87, syllabus (1982).  " 'For constructive possession to exist, the State must show that the defendant was conscious of the object's presence.' " *Id*., quoting *Gavin* at ¶ 36; *Hankerson* at 91; *Kingsland* at ¶ 13.  " 'A defendant's mere presence in an area where drugs are located does not conclusively establish constructive possession.' " *Id*., quoting *State v. Markin*, 2014-Ohio-3630, ¶ 29 (4th Dist.), citing *State v. Williams*, 2004-Ohio-1130, ¶ 25 (4th Dist.)  However, a defendant's proximity to drugs may constitute some evidence of constructive possession.  *Id*., citing *Markin* at ¶ 29, citing *Williams* at ¶ 25.  Thus, a defendant's " '[m]ere presence in the vicinity of drugs, coupled with another factor probative of dominion or control over the contraband, may establish constructive possession.' " *Id*., quoting *Markin* at ¶ 29.

"Moreover, two or more persons may have joint constructive possession of the same object." *State v. Tate,* 2018-Ohio-2765, ¶ 4 (7th Dist.), citing *State v. Smith*, 2001 WL 563077, at *3 (8th Dist. May 24, 2001).

{¶71} First, Hupp testified that Sheets lifted a mattress and she saw a white-powdered substance, along with a syringe, and cell phone. Clearly Sheets had hidden the substance in a private place, which shows he knew of its nature and had dominion over it. Evidence at the trial was that fentanyl often came as a white-powdered substance. The child, who Sheets carried immediately before she had symptoms, tested positive for fentanyl. The parents were not using fentanyl. Hupp and Filius testified that Sheets used fentanyl, an opiate. Conkel believed Filius and Hupp were under the influence of methamphetamine the evening of the incident. At least two law enforcement officers observed Sheets to be nodding off and showing other evidence of opiate use the day of the incident.

{¶72} The uncontroverted evidence was that the child was fine and had not been anywhere outside the home that day. The child then was found in the home with what was later determined to be a lethal amount of fentanyl/fluro-fentanyl in her system. Fentanyl had to have been introduced into her system someway, somewhere inside that home. Hupp and Filius admitted to using methamphetamine and marijuana and none of the evidence connected them to fentanyl. Further, Croasmun testified she believed Sheets was under the influence

of opiates that day, and Conkel, who had sat across from Sheets and Knott in an interview situation for several minutes, concluded that both Sheets and Knott were under the influence of an opiate that day. The only mention that anyone else in the home had ever used opiates was (1) Filius' testimony that he had used the drug several years before once or twice (2018), and (2) Knott's claim when interviewed the second time that Filius and Hupp used opiates, but only after Investigator Timberlake confronted her about her own opiate use. Thus, the majority of the credible evidence is that the grandparents were the fentanyl users in the home at the time of the incident. Persuasive evidence was presented that Sheets exclaimed during the 911 call that he was "fucking fucked," that he "killed her," and he "fucked up."

{¶73} As noted, proximity to drugs can constitute some circumstantial evidence of constructive possession and Hupp saw Sheets lift a mattress where drugs were located. In addition, Sheets shared the bills with Knott and the bedroom where Hupp saw the white powder and where the child had been before showing symptoms was the grandparents'. Filius' testimony and the text messages from Knott's phone show that Sheets possessed drugs and also had knowledge that Knott had them. Knott, or someone using her phone, called the dealer "Jeremy" the day before the incident, and evidence showed Sheets and Knott sometimes held

back a portion of the drugs they obtained.  Clearly, the circumstantial evidence

showed that Sheets constructively possessed the fentanyl in the household.

Involuntary Manslaughter

{¶74}   Sheets' convictions for child endangerment and possession of drugs

are not against the manifest weight of the evidence.  The evidence showed that

Sheets' involuntary manslaughter conviction had a properly supported predicate

conviction by committing both offenses.  *See Pinkerman,* 2024-Ohio-1150 at ¶ 38

and *State v Vogt,* 2018-Ohio-4457, ¶ 93.  Even if there were not sufficient evidence

on one predicate offense, he is guilty by committing the other felony if K.F.'s

death occurred as a proximate result of one of the predicate offenses.  The question

then becomes, did Sheets cause K.F.'s death as a proximate result of him

committing endangering children or possession of drugs?

{¶75}   " ' "The term 'proximate result' in the involuntary manslaughter

statute involves two concepts:  causation and foreseeability." ' "  *Pinkerman* at

¶ 38, quoting *State v. Potee,* 2017-Ohio-2926, ¶ 33 (12th Dist.), quoting *State v.*

*Hall,* 2017-Ohio-879, ¶ 71 (12th Dist.).

{¶76}   There are two components of causation:  (1) the actual cause, and (2)

the legal or proximate cause that involves foreseeability.  *State v. Platt,* 2024-Ohio-

1330, ¶ 37-38 (4th Dist.), citing *State v. Carpenter,* 2019-Ohio-58, ¶ 51-53 (3d

Dist.).

{¶77}  "In general, to 'cause' another person's death means to commit 'an act or failure to act which in a natural and continuous sequence directly produces the death of a person, and without which, it would not have occurred.' " *Id.*, at ¶ 39, quoting *State v. Price,* 2020-Ohio-4926, ¶ 33.  "Moreover, '[c]onduct is the cause of a result if it is an event, but for which the result in question would not have occurred.' " *Id.*, quoting *Price* at ¶ 33.

> [H]owever, there are circumstances under which the "but for" test is inapplicable and an act or omission can be considered a cause in fact if it was a "substantial" or "contributing" factor in producing the result. * * * "In other words, a defendant can still be held criminally responsible where the defendant's conduct combined with other occurrences to jointly result in a legal injury." [Citations and parentheticals omitted.]

*Pinkerman* at ¶ 40 (4th Dist.), quoting *Carpenter* at ¶ 52.

{¶78}  " 'The second component of causation—the legal or "proximate" cause—refers to the foreseeability of the result.' " *Id.*, quoting *Carpenter* at ¶ 53. Thus,

> [a] defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of risk created by his conduct. * * * [T]hat means that death [or serious physical harm] reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances.  [Citations and parentheticals omitted.]

*Id.*, quoting *Carpenter* at ¶ 53.  In addition, " ' "for something to be foreseeable does not mean that it be actually envisioned." ' "  *State v. Platt,* 2024-Ohio-1330,

¶ 45, (4th) quoting *State v. Wells,* 2017-Ohio-420, ¶ 35 (12th Dist.), quoting *State v. Lovelace,* 137 Ohio App.3d 206, 219 (1st Dist. 1999).

{¶79}  Further, Ohio courts have held that an overdose is a "reasonably foreseeable consequence" of the *sale* of a controlled substance.  *Pinkerman* at ¶ 41, citing *State v. Vogt,* 2018-Ohio-4457, ¶ 101-105 (4th Dist.); *State v. Patterson,* 2015-Ohio-4423, ¶ 91 (11th Dist.); *State v. Veley,* 2017-Ohio-9064, ¶ 30 (6th Dist.); *State v. Wells,* 2017-Ohio-420, ¶ 39 (12th Dist.).  " 'The possibility of an overdose is a reasonably foreseeable consequence of providing a controlled substance to another.' "  *Pinkerman* at ¶ 41, quoting *Wells* at ¶ 39.

{¶80}  Similarly, the possibility of an overdose is a reasonably foreseeable consequence of possessing a highly lethal drug within the reach of a small child who is known to put things in her mouth.  It is also a reasonably foreseeable consequence when someone has created a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support, even if the offender does not himself possess the drug but knows clearly of its existence and does not protect the child.  Thus, even if Sheets were not guilty of one of the predicate offenses of involuntary manslaughter, by causing the death of K.F., he was guilty of the other.

{¶81}  Sheets questions on appeal how the child gained access to the drug and who may have been responsible.  He also points out on appeal that there were

no witnesses who testified as to exactly how the baby ingested the illicit substance. First, the State presented circumstantial evidence regarding how the child gained access to the drug and who was responsible. The uncontroverted evidence was that this almost 11-month-old child was crawling, pulling herself up to standing, and putting things in her mouth. Her cause of death was conclusively established as a fentanyl/fluro-fentanyl overdose. As to who was responsible, the evidence showed that Sheets and Knott, who used fentanyl, had access to the child shortly before she began exhibiting symptoms. Each knew that the other used the drug. Conkel testified Sheets and Knott were under the influence of opiates at the time they were interviewed the same evening. Knott admitted they were not clean in the weeks leading up to the incident when interviewed by Investigator Timberlake. The other adults in the home admitted to methamphetamine and marijuana use, showed symptoms of meth use, and the only evidence that even remotely linked them to fentanyl came from Knott as well as Filius' concession that he had used opiates around 2018. Further, Sheets can be heard on the 911 call saying among other things, "I fucking killed her, Amye."

{¶82} To establish the defendant's actions were the proximate cause of K.F.'s death does not require proving precisely how the child ingested the drug. For example, the Supreme Court of Ohio upheld a conviction for involuntary manslaughter when the predicate offense was having a weapon under disability,

even when the evidence did "not make it definitively clear who shot and killed [the victim]." *State v. Crawford,* 2022-Ohio-1509, ¶ 12. The court emphasized that the issue is "[t]he foreseeable harm is what matters for proximate cause." *Crawford* at ¶ 16.

{¶83} In *State v. Gruden*, the Third District upheld convictions for involuntary manslaughter resulting from drug abuse. 65 Ohio App.3d 777 (3d 1989). The evidence in *Gruden* was that the defendant's daughter was visiting in his home, she had been put down for a nap in the bedroom, and the defendant had fallen asleep on the couch in the living room. An undetermined amount of cocaine belonging to the defendant was lying on a coffee table beside the couch. It was assumed that the child apparently woke up, came into the living room while the defendant was still asleep, ate some of the cocaine, and expired from cardiac arrest. *Gruden* at 779. After EMS arrived, the defendant blurted out at least three times, "I killed her." *Id.,* at 781. In *Gruden*, there was evidence of how the child ingested the cocaine because the defendant deduced, "she ate the coke I had on the table." *Id.*

{¶84} Even so, the defendant/father in that case asserted on appeal that the evidence was insufficient to establish the drug possession proximately caused the death of his daughter. *Id.,* at 783. The Third District rejected his claim, holding that "reasonable minds could readily have concluded . . . that the infant's death was

proximately caused by defendant's conduct in leaving a gram of cocaine unattended on a coffee table, well within the reach and propensities of a 13-month-old child." *Id.*, at 784. Here, it is uncontroverted the child died of an overdose of fentanyl. The grandparents used fentanyl and Hupp saw a white powdered substance later in the day in the same bedroom out of which Sheets had carried the child immediately before she showed the effects of the opiate. The child was almost 11 months old and certainly had the propensities to put things in her mouth. Sheets' drug possession was clearly a proximate cause of the child's death.

{¶85} In addition, Sheets challenges on appeal the State's depiction of the 911 call. During trial, the State provided a listening aid to the jury during the playing of the 911 call. Sheets claims that this listening aid was an inaccurate description of what was actually said during the 911 recording. Sheets points out that many of the statements on the recording are inaudible, the persons speaking are hard to understand, and that it is very difficult to determine what statements should be attributed to whom.

{¶86} First, the 911 listening aid was not submitted as an exhibit when the jury deliberated, but both the State and defense in closing beseeched the jury to listen carefully to the 911 call itself, which was an exhibit. Second, witnesses Crapyou, Filius, and Hupp identified the male voice on the 911 call as Sheets. Third, a careful examination of the recording shows that Filius could not have been

the male voice on the recording, as the speakers continually ask where Filius had gone. Further, independent evidence showed that Filius had gone to the park to get Hupp before or shortly after the 911 call was made, such that Sheets was the only one left in the house during the 911 call. In addition, a careful review of the audio reveals that a male voice at certain points says, "I'm fucking fucked," "I fucking killed her, Amye," and "I fucked up." Further, when listening to the 911 call it becomes apparent that the male voice on the tape is sobbing or in distress and clearly could not have been administering CPR as Sheets and Knott once claimed. Importantly, the trial court issued a specific jury instruction that the listening aid was just that, and that the jury should listen to the 911 call itself to determine what was said exactly.

{¶87} This 911 evidence is telling because the authorities did not know what caused the child's death until two months after the calls were made. Yet, Sheets seemed to know that he had harmed the child on the day of the offense.

{¶88} Sheets also contends that no physical evidence links him to the child's death. However, as we discussed above, a defendant may be convicted solely on circumstantial evidence. Further, while the law enforcement "searches" did not lead to the finding of any physical drugs, Conkel explained that the search that evening was limited. Importantly, Hupp testified that she saw a white powder substance, syringe, and phone hidden under the mattress on the day in question.

{¶89} Sheets further posits that Hupp's and Filius' testimony was self-serving and their statements could not be trusted. He submits that they initially lied about their own and the others' drug use, and additionally that the pair took plea deals. For one thing, some of what Hupp and Filius testified to was corroborated by other evidence. For another, Hupp and Filius testified to several facts that cast themselves in a negative light. And, "the jury, as the trier of fact, is in the best position to evaluate credibility." *State v. Mitchell,* 2019-Ohio-5168, ¶ 32 (3d Dist.), citing *State v. DeHass,* 10 Ohio St.2d 230, 231 (1967). Moreover, the fact that the jury acquitted Sheets of Count Four, aggravated possession of drugs (methamphetamines), showed that they carefully deliberated and considered the evidence.

{¶90} We conclude that the jury did not clearly lose its way and create a manifest miscarriage of justice. A rational trier of fact could have found that appellant created a substantial risk of death or a risk of some permanent incapacity when he possessed the fentanyl compound within reach of the small child, and further that he created a substantial risk to K.F.'s health and safety when he violated a duty of care, protection and support. Further there is ample evidence that he constructively possessed the fentanyl. It is uncontroverted that these actions led to K.F.'s death. Hence, we find that the jury did not clearly lose its way and therefore overrule Sheets first and second assignments of error.

{¶91}   Having found no merit to either of appellant's assignments of error,

the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J. concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**